IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRAGAN VIDOVIC, *et al.*,                    )    CASE NO.:    1:10 CV 1833
                                             )
   Plaintiffs,               )
                                             )
v.                                           )    JUDGE DONALD C. NUGENT
                                             )
MENTOR CITY SCHOOL DISTRICT, *et al.*,       )
                                             )
  Defendants.                      )    <u>MEMORANDUM OPINION</u>
                                             )    <u>AND ORDER</u>
                                             )


   This matter is before the Court on cross motions for Summary Judgment.  (ECF #84, 86).

Both parties have submitted responses and replies to the motions for Summary Judgment.  (ECF #88,

92, 94, 97).  The Court has carefully considered all of the pleadings, motions, briefing, and relevant

law, and finds that Defendants' Motion for Summary Judgment (ECF #84) should be GRANTED

and Plaintiffs' Motion for Summary Judgment (ECF # 86) should be DENIED.

## PROCEDURAL HISTORY

The Plaintiffs filed this action in August of 2010 on their own behalf, and on behalf of the estate of their minor daughter, Sladjana Vidovic.  Plaintiffs sought leave to file an Amended Complaint in August of 2011, which was granted.  (ECF #16, 30, 33).  The Amended Complaint seeks declaratory, injunctive, and monetary relief against the Mentor Public School District, Jacqueline A. Hoynes (Superintendent of the Mentor Public School District), Joesph Spiccia (Principal of Mentor High School), Pam Goss (guidance counselor), and John Does 1-10 (employees of Mentor High School), for alleged violations of the Plaintiffs' civil rights.  (ECF #16, Ex. 1).  The Amended Complaint alleges that Sladjana Vidovic, a sixteen year old student at Mentor High School, was regularly bullied and harassed at school by numerous other students; that the school, and especially Defendants Hoynes, Spiccia, and Goss knew or should have known about the bullying and harassment; that the school also knew that bullying was a long term, systemic problem at Mentor High School; that the Defendants did not intervene or appropriately address the problem; that Defendants' failure to adequately address the bullying and harassment of students was policy and practice of the Mentor Public School District Board of Education; and, that as a result of the constant bullying and harassment, Sladjana Vidovic had to leave the school and eventually became so depressed that she committed suicide. (ECF #16, Ex.1).

Plaintiffs allege that the Defendants' acts and omissions constitute a violation of their rights in violation of the substantive and procedural due process clauses of the Fourteenth Amendment, as well as the Equal Protection Clause of the United States Constitution.  Plaintiffs also allege that the Mentor Public School District maintained policies and procedures facilitating

these constitutional violations and failed to train its employees to prevent bullying.  Plaintiffs further assert that the actions of the Defendants constitute a violation of Title VI, 20 U.S.C. § 2000(d) and Title IX, 20 U.S.C. § 1681, and that Defendants were negligent, and/or malicious under Ohio law.   (ECF #16, Ex.1).  A spoliation of evidence claim was also added to the Amended Complaint alleging that documents containing notes of meetings between Ms. Vidovic and her counselor, Pam Goss, were shredded or otherwise destroyed after the school was notified that this lawsuit was filed. (ECF #16, Ex.1).

Defendants contend that 42 U.S.C. §1983 and Title IX do not support causes of action on behalf of Ms. Vidovic's parents, and that there is no evidence that the school was aware of any bullying or other discrimination Ms. Vidovic may have suffered based on her gender or nationality.  Moreover, Defendants argue that a school's failure to prevent a teenager's suicide, even if it is precipitated by bullying, does not create liability under any of the Plaintiffs' legal theories.  Further, Defendants contend that they did appropriately address the bullying and harassment aimed at Ms. Vidovic, and that they did not have a policy or practice of ignoring or tolerating bullying in the Mentor schools.  Finally, Defendants also challenge the causal link between the alleged bullying and Ms. Vidovic's act of suicide.   Defendants seek dismissal of the spoliation of evidence claim because they claim the evidence shows Ms. Goss was unaware of the lawsuit when she destroyed her counselor notes relating to Ms. Vidovic pursuant to a standard document retention policy.

## **FACTUAL BACKGROUND**[1]

---

[1]

Except as otherwise noted, the factual summary is based solely upon the undisputed facts

A.  Life in Bosnia

Sladjana Vidovic led a difficult and troubled life from the beginning.  She was born in 1992 in  Bosnia at the beginning of the Bosnian war.  (C. Vidovic Depo. at 10-14; Ex. C).  She and her family were displaced from their home, and several family members were killed or injured during the war.  (C. Vidovic Depo. at 39-41; Ex. C).  At the end of the war, the family discovered their house had been damaged, and although they were able to renovate they decided to move to the United States for better opportunities.  (C. Vidovic. Depo. at 11-13).  In 2001, when Ms. Vidovic was about eight or nine years old, she moved with her family to Willoughby, Ohio.  (G. Vidovic Depo. at 7-9; C. Vidociv Depo. at 13).   Ms. Vidovic and her siblings did not speak any English when they arrived in the United States.  (C. Vidovic Depo. at 14).

B.  Elementary School (Willoughby Schools)

Sladjana Vidovic entered McKinley Elementary School in Willoughby.  (C. Vidovic Depo.at 14).  Mrs. Vidovic was happy with the efforts the McKinley school took to include Sladjana in school functions and provide special care and encouragement to her, as well as to assist her with the language barriers.  (C. Vidovic Depo. at 17-18).   According to Mrs. Vidovic, both Sladjana and her little brother Goran did not like going to school at first, but later came to

---

set forth in the Parties' statements of facts, the Plaintiffs' Amended Complaint, and the deposition transcripts filed with the Court as part of the summary judgment motion briefing.  Those facts which are contested and have some support through deposition testimony, affidavit, or other evidence will be addressed in the "Analysis" section below and shall be construed in the light most favorable to the Plaintiff as required under the Summary Judgment standards.  Facts that are "contested" but not contradicted by any admissible evidence will be accepted as true for purposes of this opinion in accordance with the requirements of the summary judgment standard.  *See, Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

like school in Willoughby.  (C. Vidovic Depo. at 21-22).  In her suicide note, however, Sladjana indicated that prior to moving to Mentor (which would mean while in Willoughby schools) people picked on her because of her accent and that way she dressed.  (ECF #88-8).  In middle school in Willoughby, she said she was made fun of for being different than the other Croatian people there, and she told her parents she wanted to move.  (ECF #88-8).  Sladjana's older sister, Suzana, who was in high school in Willoughby, experienced problems with teasing, a lack of friends, and getting in trouble because she was unable to communicate effectively due to the language barrier.  (C. Vidovic Depo. at 22-25).  Suzana was so unhappy there that she told one of her friends that she was going to kill herself.  (C. Vidovic Depo. at 25).  Mrs. Vidovic testified that Suzana told the school that she was unhappy because of issues at home and the high expectations and demands of her parents, but that the real reason she was unhappy was because of school.  (C. Vidovic Depo. at 25-30).  After approximately two years the family moved to Mentor.  (G. Vidovic Depo. at 7-9; C. Vidovic Depo. at 13, 22).  Around this same time, Mrs. Vidovic was became very ill and required surgery.  (C. Vidovic Depo. at 36-37).

C.  Ridge Junior High (Mentor Schools)

Sladjana Vidovic had academic problems and disciplinary problems at Mentor's Ridge Junion High and was also in trouble or under pressure at home.   (Kinsey Depo. at 51-55; Gingo Decl., Ex. 8; Nasca Depo. at 23).  Her teachers and tutors found her to be disruptive and believed that she was not applying herself to her studies.  (Gingo Decl., Ex. 8).  She was accused of stealing money from another student.  She denied the charge and was not disciplined by the school, although the principal did meet with her parents .  (C. Vidovic Depo. at 44-46).  She also had social problems, including being the victim of name-calling, participating in name-calling,

and a pattern of befriending and un-friending the same students repeatedly.  (Nasca Depo. at 20, 25-32, 68-69).  Ms. Vidovic's brother testified that she would occasionally come home crying.  (G. Vidovic Depo. at 34, 37).   Ms. Vidovic had at one point during her middle school years told the school, and another friend that her parents had physically abused her or threatened physical abuse.  (Kinsey Depo. at 56; Moss Depo.at 35-48).  These claims were investigated but were not substantiated.  (Kinsey Depo. at 56).

     In 2004 Ms. Vidovic reported to the counselor that she had been called a lesbian on one occasion. (ECF #88, Ex. C).  In 2005, she reported several "friendship issues" over the course of the year.  (ECF #88, Ex. C).  The next report logged by the guidance counselor did not come until over a year later, when she reported having trouble with boys and rumors about boys.  (ECF #88, Ex. C).  Coinciding with these reports about rumors regarding a boy, the counselor's log indicates that Ms. Vidovic made a suicide threat in April of 2007.  (ECF #88, Ex. C).  Although Mrs. Vidovic does not recall every having been informed of this threat, the school officials testified that their protocol was to inform the parents, and that they had followed up on the threat.  (Nasca Depo. at 69-72).   Eventually, her parents sought a transfer to another junior high in the Mentor school system because she had been subject to harassing phone calls over the summer break.  (O'Keefe Depo. at 12-13; Gingo Decl., Ex. 5).  The transfer was denied and the school told Ms. Vidovic's parents that they believed she was safe at Ridge.  (O'Keefe Depo. at 12-13; Gingo Decl. Ex. 5 ).

     After the transfer was denied, Sladjana returned to Ridge for ninth grade.  She reported a few incidents of alleged bullying during ninth grade and, where the alleged bully could be identified, each incident was responded to and resolved by the school.  (Moss Depo. at 27-29, 32-

35; Kinsey Depo. at 63-65; Nasca Depo.at 38).  Around ninth grade, Ms. Vidovic started hanging out with the "gangster group," a group of kids known to be a bad influence, likely to skip classes, put people down, not care about schools, or otherwise be trouble makers.  (Jandric Depo. at 28-32).   Ms Vidovic was also known to have cut class in ninth grade to hang out in the cafeteria with a friend.  (Nelson Depo. at 128-129).  Generally, her friends thought she seemed relatively happy at Ridge.  (Jandric Depo. at 41-42).

>        D.  Mentor High School

In the Mentor School District, high school began in tenth grade.  Sladjana Vidovic attended Mentor High School in tenth grade, which was her only full year of high school.   Ms. Vidovic continued to have social problems and alleged bullying issues with other students at Mentor High School.  (S. Vidovic Depo. at 218-223).  One of her friends, Mr. Beganovic, testified that he heard other students calling Ms. Vidovic names, including bitch and Slutidjana, and was present during the one incident when students who had previously been her friends threw a biscuit at her.  (Beganovic Depo. at 16-20, 25-28).   Another friend, Ms. Jandric, testified that Ms. Vidovic told her about being bullied and about people calling her names.  She also testified that Ms. Vidovic would generally ignore these comments or make a joke back, but that she seemed bothered by them. (Jandric Depo. at 46-49).   Ms. Jandric also referenced several people who once had been friends with Ms. Vidovic but later became estranged or were mean to her.  Mr. Beganovic also indicated that many of the insults Ms. Vidovic suffered came from people she had been friends with and later became friends with again. (Beganovic Depo. at 16-23, 25-28).

Ms. Vidovic discussed a name-calling incident with her counselor Ms. Goss, whom she

visited on a regular basis. (Goss Depo. at 42-49). That issue was directly addressed by Ms. Goss who called the other student in and resolved the problem through supervised mediation. (Goss Depo. at 42-49). Ms. Vidovic's friends also testified that she had complained of, or they had witnessed, other name-calling incidents, but there is no evidence any other such incidents were reported to anyone at the school. Ms. Vidovic also continued to have disciplinary issues. She was given an out-of-school suspension for pulling another student's hair. She was also disciplined for repeated tardiness, skipping classes, leaving class without permission, and not appearing for assigned detentions. (Gingo Decl., Ex. 2). Her friend testified that she also was known to use vulgar language and to participate in name-calling. (Beganovic Depo. at 18-19, 24, 32). Ms. Vidovic's brother testified that he had overheard Ms. Vidovic talking to her parents about problems at her high school, and that whenever she had problems at school she would tell them she did not want to go to that school anymore. (G. Vidovic Depo. at 34-37). He also testified that she would come home crying or upset weekly during the year she spent at Mentor High School. (G. Vidovic Depo. at 34-37).

Ms. Vidovic did, however, have a meaningful group of friends in high school that she spent a substantial amount of time with. In the Spring of 2007, she had a sixteenth birthday party with a guest list of approximately 15 to 30 guests. (Jandric Depo. at 99; Beganovic Depo. at 45-48; Fioritto Depo. at 18-19:S. Vidovic Depo. at 205). After the party she was really sad because she said someone stole things from her house during the party. (Jandric Depo. at 100-101; Fioritto Depo. at 20). She wanted to fight the girl she believed had stolen from her and set up a time to fight after school, but the fight never occurred. (S. Vidovic Depo. at 198). Ms. Vidovic was close to two of the school's security guards, "they liked her and she liked them, and they

were always nice to her." (Jandric Depo. at 109). She also continually met with her school guidance counselor, Ms. Goss, to discuss anything that was troubling her at school, or with friends. (Jandric Depo. at 75; Goss Depo. at 42; C. Vidovic Depo. at 142).

The documents submitted by Plaintiffs appear to show that Ms. Vidovic had been seeing a counselor and/or psychiatrist regularly while she was attending Mentor High School, from about September of 2007 through February of 2008. There is one additional counselor note from June of 2008, and then nothing again until September of 2008, about three weeks before her suicide. The notes indicate that Ms. Vidovic reported being stressed about school, social interactions, and incidents of bullying. (ECF #88-3). Her prognosis varied from fair to good. She had been prescribed medication to address her depression and she had been taught different coping mechanisms to deal with stress and worries. (ECF #88-3). In September of 2007, Ms. Vidovic had reported having "some passive suicidal ideation" and a safety plan was discussed whereby she would talk to her sister. She was referred to a doctor for a medication consultation at that time. (ECF # 88-3 at 5).

On November 13, 2007, Ms. Vidovic and a friend were in the stairwell at school when Ms. Vidovic claims she was pushed by Jerry Markley. Ms. Vidovic reported this incident to a security guard and was sent to the nurse to ensure that she had not been injured. The school investigated the incident, determined that it was an accident. Ms. Vidovic and Mr. Markley were friends again after, and Mr. Markley was invited to her birthday party later that year. (Spiciia Depo. at 65-66; B. Markley Depo. at 16-18; G. Markley Depo. at 12-14; S. Vidovic Depo. at 190-191). The day she had been pushed on the stairs, Ms. Vidovic came home from school crying, walked into the kitchen and tried to stab herself with a knife. (G. Vidovic Depo. at 40-

-9-

41).   Her mother indicated that she had threatened to kill herself.  (C. Vidovic Depo. at 117-

119).[2]  Based on this incident and her continual crying and problems at school, she was

hospitalized at Laurelwood Hospital on December 18, 2007.  (G. Vidovic Depo. at 44).

She was discharged from in-patient treatment at Laurelwood before Christmas, but

continued to participate in a self-esteem program at Laurelwood through early January. (C.

Vidovic Depo. at 120-121).   On January 9, 2007, she was fully discharged from the partial

hospitalization at Laurelwood, and Laurelwood told her she was ready to go back to school.

(Joiner Report at 2; C. Vidovic Depo. at 121).  While at Laurelwood, Ms. Vidovic was diagnosed

with Major Depressive Disorder and Dysthymia, a low-grade, chronic mood disorder.  (Joiner

Report at 2; C. Vidovic Depo. at 121).  Her records show that she had been suffering from

depression since the age of nine years old. (Joiner Report at 2; C. Vidovic Depo. at 121).

During her tenure at Laurelwood, Ms. Vidovic wrote in her diary a combination of happy

and sad emotions.   (C. Vidovic Depo. Ex. C).  She indicated that she still had ideations of

suicide before her discharge, but at other times also expressed excitement at seeing her friends,

and especially a boy named Kevin, whom she met at Laurelwood.  (C. Vidovic Depo. at 170, Ex.

C).  She also indicated that her mother likely would read her diary and so she would not write

everything that she was really feeling but stick only to talking about school issues.   (C. Vidovic

Depo. Ex. C). The diary also indicates that when she returned to school she told only a select few

people about why she had been out, and she believed that many people she thought had been her

friends were not actually real friends.  (C. Vidovic Depo. Ex. C; S. Vidovic Depo. at 250-255).

---

[2]

Counselor notes indicate that she never tried to cut herself until after she had been admitted
to Laurelwood.  (ECF #88-3 at 4).

-10-

In December of 2007, after Ms. Vidovic had been hospitalized, but before the holiday break, the Vidovics met with school officials to discuss Ms. Vidovic's re-entry to the school setting. (Coleman Depo. at 18-19). They met again on January 3, 2008. (Coleman Depo. at 12, 22, 30, 32; Hoynes Depo. at 37; Iannadrea Depo. at 14, 16; Spiccia Depo. at 45-46; Goss Depo. at 51).[3] The family reported two school incidents involving Ms. Vidovic allegedly being pushed on the stairs, and having her purse dumped out in the cafeteria. (Coleman Depo. at 18-19). The main point of the meeting was to establish a safe place for Ms. Vidovic to go if she was upset at school because her family was worried she would try to kill herself at school. (Goss Depo. at 16, 51; Hoynes Depo. at 54; Coleman Depo. at 32). Several adults were identified including her counselor, her tutor, and the school social worker, as people Ms. Vidovic could go to if she was feeling upset. (Coleman Depo. at 34).   When Ms. Vidovic returned to school she met with Ms. Goss and Ms. Iannadrea, the social worker, and continued to meet with them throughout the year. (Iannadrea Depo. at 23-16, 39; Goss Depo. at 54-56). Ms. Goss also asked the lunchroom security guard to watch Ms. Vidovic in the lunchroom, and Ms. Bunjevac, the guard, did keep an eye on her and saw nothing of concern. (Bunjevac Depo. at 41, 52).

Ms. Vidovic was seeing a private psychologist or counselor both before her commitment to and after her release from Laurelwood. (S. Vidovic Depo. at 238-240). She was also on medication at some point both prior to and after her hospitalization. (C. Vidovic Depo. at 119, 162-164). Several weeks after her release, she told Ms. Iannadrea that she had run out of depression medication. (C. Vidovic Depo. at 24-26). On January15, 2008, Ms. Vidovic reported

---

[3] Mrs. Vidovic only recalls one meeting with the school officials. (C. Vidovic Depo. at 124-126).

-11-

to Ms. Goss that she had thoughts of killing herself.  (Hoynes Depo. at 97-98).  Ms. Goss notified Ms. Vidovic's family and her sister picked her up immediately, indicating that she would move Ms. Vidovic's therapy session, which was set in February, to the following week.  (Hoynes Depo. at 98; C. Vidovic Depo. at 128-130).  Counselor notes for January 21, 2008 do not mention any threat of suicide.  (ECF #88-3 at 8).  Notes from February 2, 2008 indicate that the session was cancelled due to a conflicting doctor's appointment.  (ECF #88-3 at 8).

Later during that school year, in 2008, Ms. Vidovic informed Ms. Goss that she was no longer seeing her private counselor.  (Goss Depo. at 72).  Ms. Goss made attempts to contact Ms. Vidovic's parents and her older sister to notify them of this, but she was unable to reach any of them.  She did leave a message asking them to contact her.  No one ever called her back.  (Goss Depo. at 72-73).  There are no notes that would indicate that Ms. Vidovic met with her counselor anytime between Feberuary 5, 2008 and September 9, 2008.

During the spring of 2008, Ms. Vidovic contacted Mr. Spiccia twice to complain about her peers.  Both issues were addressed, and Mr. Spiccia believed they had been resolved.  (Spiccia Depo. at 40).  Around this same time, Ms. Vidovic and her father met with Ms. Goss and Mr. Diamond.  Ms. Bunjevac served as a translator at the meeting.  (Diamond Depo. at 20; Goss Depo. at 82; Bunjevac Depo. at 27-28).  During this meeting the group discussed the possibility of home schooling for Ms. Vidovic.  (Bunjevac Depo. at 33).

Ms. Vidovic had academic and disciplinary problems during the 2007-2008 school year, in addition to the social issues set forth above.  (Goss Depo. at 71; Bunjevac Depo. at 25; Hanna Depo. at 17; Gingo Decl. Ex. B; G. Markley Depo. at 31-37).  On the last day of the 2007-2008 school year, Ms. Vidovic was suspended for fighting with another girl following a dispute that

-12-

arose during a "water bottle fight." She received a suspension that carried over into the next school year.   (Hoynes Depo. at 102; Nelson Depo. at 27-32).  As a result of this fight, Ms. Vidovic had to meet with a Lake County Department of Jobs and Family Services intake officer. (Sisa Depo. at 19-23).  The intake officer, discussed the possibility of home schooling with Ms. Vidovic and her mother.  (Sisa Depo. at 28-30).

When she returned to school in the fall of 2008, she met with Ms. Goss, who had also emailed all of Ms. Vidovic's teachers and the security guards to alert them to Ms. Vidovic's prior complaints of bullying; to ask them to watch out for her; and, to ask that she be allowed out of class if upset.  (Goss Depo. at 86-87; Gingo Decl. Ex. C).   Ms. Vidovic told her that she would be switching to home schooling that year.  (Goss Depo. at 86-87).

Her private counselor notes from that fall indicate that on September 9 of 2008, Ms. Vidovic reported she had been threatened over the summer, that her stress was increasing with regard to school, and that she mentioned home schooling.  Her functioning on that date was considered moderate; her prognosis was good.  (ECF #88-3 at 9).  On the 15th of September she reported having increased sadness, crying, and stress since the school year started.  She told the private counselor that she had talked to the school but got no relief, and that she had talked to the principal about changing schools or starting home schooling.  She also reported that her boyfriend and his female friends began bullying her and had threatened her.   No prognosis was indicated, although the notes reported progress with self esteem and family relationships over the summer.  (ECF #88-3 at 3).

On September 23, 2008, private counselor notes indicate that Ms. Vidovic was worried about her peers, had been threatened by girls and that she tried to get help from the school, but

they did not help.  (ECF #88-3 at 3).  They also indicate that Ms. Vidovic would be starting home school.  Her progress was listed as optimistic and the counselor observed that she was very happy and relieved not to be going back to school.  The notes also reported that Ms. Vidovic had a brighter affect and positive mood, that she was going to change her phone number, and that she was motivated for college.  Her prognosis was listed as "good," and she reported no risk of suicide.  (ECF #88-3 at 3).

Ms. Vidovic entered home schooling with the Ohio Virtual Academy in late September, most likely September 29, about a week prior to her death.  (Gingo Decl. Ex. D; C. Vidovic Depo. at 152; S. Vidovic Depo. at 233).  She met with Mr. Spiccia prior to leaving Mentor High School to let him know she was withdrawing.  (Spiccia Depo. at 83-85).  She told her brother that home schooling was fun, and her mother believed she was happy once the home schooling started.  (G. Vidovic Depo. at 51; C. Vidovic Depo. at 167-68).

On October 1, 2008, Ms. Vidovic helped her brother and some other friends to skip school and stay with her for the day.  (C. Vidovic Depo. at 153; G. Vidovic Depo. at 55-59; Kinsey Depo. at 75; Gingo Decl. Ex. 3).  One of the boys disappeared later in the day and the police came to Ms. Vidovic's house.  (C. Vidovic Depo. At 156-159; G. Vidovic Depo. at 62-64).  They asked to see Ms. Vidovic's phone to see if she had been in contact with the missing boy.  (G. Vidovic Depo. at 62-64).  Ms. Vidovic and her brother had told her parents and the school that her brother had been sick, however after the police came to the house, the truth was uncovered.  (G. Vidovic Depo. at 52-62; C. Vidovic Dep. at 156-159).  Ms. Vidovic was grounded from her phone and her brother was grounded from video games for their behavior.

-14-

(G. Vidovic Depo. at 59-60).[4]   The next day, October 2, 2008, Ms. Vidovic committed suicide at her home.  (C. Vidovic Depo. at 158-159).

Her suicide note was written in two parts, an English section and a mixed English/Croatian section directed specifically at her family members.  In it,  Ms. Vidovic indicated that she had problems "every single day of my life hear [sic]" in the United States. (ECF #88-8 at 1).   She referenced being picked on prior to moving to Mentor because of her accent, the way she dressed, and the differences between her and other Croatian people who had a different culture.  (ECF #88-8 at 1).  She did not have any friends or guy friends in seventh grade and in eighth grade was upset because kids made fun of her name.  (ECF #88-8 at 1).   She wrote that she became depressed and didn't want to live anymore starting in eighth grade, but her parents helped her through and she started ninth grade more confident.  (ECF #88-8 at 1).   In ninth grade she indicated that she started hanging out with "gangsters," that her grades dropped, and she was hanging out with the "wrong crowd."  (ECF #88-8 at 1).   She wrote about some issues she had with a guy that her parents didn't like during a summer in Europe, and getting in trouble because of him.  She also wrote that after visiting family in Bosnia she was very upset when she had to return to the United States ("saying goodbye was the hardest thing ever4me....In the taxi I was crying liek [sic] a baby :( ") .   (ECF #88-8 at 1).   She expressed that she felt out of place when she returned to the United States; that her "gangster" friends "went against" her; that she ate her lunch in the bathroom and cried daily because she had no friends; and, that her old friends threatened her, threw food at her, and knocked her books.  (ECF #88-8 at 1).  Her

---

[4]
  Mrs. Vidovic testified that although she contemplated disciplining the children over this incident, nothing was ever done because Ms. Vidovic committed suicide the next day.  (C. Vidovic Depo. at 158-159).

suicide note also mentioned that she was pushed on the stairs and "almost fell, but hit her head."[5] (ECF #88-8at 1).

In her note, Ms. Vidovic indicated that she began cutting herself; that once her parents saw her with a knife so they took her to a hospital; that she was in the hospital for about 4-5 weeks; and, that she tried to commit suicide two times while hospitalized. (ECF #88-8 at 1).[6] She wrote that she had not wanted to go back to school, but she did after Christmas break and began to stand up for herself when she returned. She admitted to hitting, pulling hair, and scaring girls who picked on her or said things to her; and said that she ignored or made jokes with guys who would say things to her. (ECF #88-8 at 1-2). She indicates in the note that she was acting out physically against girls who talked about her, and that she was "embarrassing my family of how I was acting at school." (ECF #88-8 at 2). After one incident when she caused another girl to cry because she was getting ready to punch her, Ms. Vidovic indicated that no one bothered her again until the last day of school. (ECF #88-8). On the last day of school, in the Spring of 2008, Ms. Vidovic and some other students got permission to have a water bottle fight. When Ms. Vidovic got hit in the jaw with a water bottle a real physical fight ensued that led to the other girl's expulsion, and Ms. Vidovic's appearance in juvenile court. (ECF #88-8 at 2). After discussing all these events, she said "I never thought of committing suicide again until now." (ECF #88-8).

---

[5]

 In several other reports of the incident, Ms. Vidovic told school officials, family and friends that she had been pushed down the stairs, or pushed down a flight of stairs.

[6]

As set forth in an earlier description of the submitted evidence and testimony, there are conflicting reports as to whether Ms. Vidovic tried to cut herself at that time, or whether she attempted suicide only once after being hospitalized.

-16-

The next paragraph of her suicide note reads as follows:

this year was ok but I just didn't want2 b hanging with the wrong crowed or b
fighting or cutting because of people so I thoughtgetting homeschooled might b
betetr btu idk will c.  my dad still hates me :(
I mean he loves me but he dosent liek how I hid shit behind his & my moms back,
I mean any parent woudl do the same for thier kids just liek my parents did, im
proud I have parents liek mine but I just feel so bad, that y just now again I felt
liek commiting suicide kauz my dad said I brough so much drama into our familys
life, problemss at school, people I hand out with, $ they spend on me & not to
mention how I crashed suzanas car racing because I was trying 2 show off infront
of friends & also having my sweet16 b-day party & getting a lot of things stolen
form my house.  I felel really bad because my parents & my family loves me &
they r my best friends because they r the 1ns that r always ther e4 me but

r.i.p. sladjana vidovic

(ECF #88-8 at 2).  The note continued in Croatian (translated below) and English as follows:

Mom and dad I love you very much
I know that I have never shown it to you, I am still a child and did not know how
to express myself, you would tell me one moment that I am smart and then the
next moment something else, I know you are going to suffer because I killed
myself but I can not live any longer with my mistakes and every time I hurt you
some more, I love you and thank you for bringing me into this world but you have
created me to live as a proper child and not like some mafia.  I am sorry but you
have told me that I only create problems for you, here is the last problem that I
have for you, there is money I have saved on that card, also go to limited 2 this
Friday and pick up my last check so you can pay off all the debts I have created
for you.
Mom you told me to talk to somebody when I have these thoughts of killing
myself, but there is nobody to talk to, Suzan and yourself are not willing and
Goran is too young.  Sis I am happy you found your soul mate all the best to you
and Ivan and do not let me stand in your way...

brother you are the youngest and I love you the most, you have always been there
for me I apologize for all our quarrels and fights when I would hit you.... I love
you ... do not allow anybody to bully you, grow up and be a good boy...

I hate the way people treated me at school & I m not pretty but it was true they did
treat me liek shit I was rly nice 2 every1 I always said hey 2 every1 but no I was
wiered 2 them :(
im soooo sry if I brought a lot of problems2u I love you guys all however you
have enough money that I have saved to pay for my funeral ... ...  I know that I did

-17-

not show you that I love and respect you but since I am not a good child I then
figured out that this has to happen...I should not have stayed alive for so long.

brother... don't try doing anythiogn to urself u were right we shoudl of told mama
I tata the truth right away but I was scared2 tell them now that they know the truth
I cant livce like this no more I keep making every1 upset I never made any1 happy

I cannot believe I am doing this to myself because I could not wait to grow up and
become something but I know I will never become a better child :{

... DAD SOME PEOPLE HAVE STOLEN ALL OF THAT FROM ME BUT
LET ME TELL YOU WHENEVER I LIED TO YOU IT WAS NOT SO BAD
THIS IS THE FIRST AND LAST LIE I HAVE EVER SAID

...

(ECF #88-8 at 3-8).

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those
> portions of 'the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with affidavits, if any,' which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material"

only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires

consideration of the applicable evidentiary standards.  The court will view the summary

-18-

judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence

presented is "merely colorable" and not "significantly probative," the court may decide the legal

issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).  In most

civil cases involving summary judgment, the court must decide "whether reasonable jurors could

find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.*

at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmover.  The nonmoving party may not simply rely on its pleadings, but must "produce

evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't*

*of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as

an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

-19-

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

A. Due Process Claims (Count One)

       1. Substantive Due Process

In Count One, Ms. Vidovic's parents assert a claim, in their individual capacity, and on behalf of Ms. Vidovic's estate, alleging that they were deprived of their procedural and substantive due process rights under the Fourteenth Amendment of the U.S. Constitution. Individual claims for violations of substantive due process arising under the Fourteenth Amendment are enforceable through 42 U.S.C. § 1983 ("Section 1983"). In order to recover under this statute, a plaintiff must show that a person acting under the color of state law, deprived the plaintiff of a federal right. *McQueen v. Beecher Cnty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006).

Plaintiffs claim that the school, acting under the color of state law, deprived them of their substantive and procedural due process right to familial association, which is a liberty interest under the due process clause. They also allege that the school deprived Ms. Vidovic of her rights to life and liberty, and deprived her of her familial relationships and right to an education. Under the Due Process Clause of the Fourteenth Amendment, no state can deprive "any person of life, liberty, or property, without due process of law. However, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens

-20-

against invasions by private actors." *DeShaney v. Winnebago County Dept. Of Soc. Services*, 489 U.S. 189, 195 (1989).  Therefore, absent one of two exceptions, "it is not a constitutional violation for a state actor to ... fail to rescue those in need," and the state has no constitutional duty to protect or rescue its citizens.  *Peete v. Metro. Gov't*, 486 F.3d 217, 223 (6th Cir. 2007); see also, *DeShaney*, 489 U.S. at 196, 201.  Exceptions to this rule apply when (1) the state has custody of the person in need or some other "special relationship" that heightens their responsibility to care for a particular citizen; or (2) when a state actor acts affirmatively to create or greatly increases the risk of harm to its citizens.  *DeShaney*, 489 U.S. at 195.

In this case, the Plaintiffs' Amended Complaint does not allege that Ms. Vidovic was in state custody, or that any special relationship existed between her and the school that would have given the state a heightened level of responsibility for her care and protection.  While it may seem that a school, of all places, should provide a safe and supportive environment for the children in its care, it is well settled that a school does not meet the requisite level of control over its students to give rise to a constitutional duty to protect.  *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997); *DeShaney*, 489 U.S. 189.

Neither party has cited any relevant facts or law that would support a finding that the school was in a "special relationship" as that term is used in the relevant case law.  In fact, many of the incidents Ms. Vidovic complained of, especially those that involved threats of physical violence and occurred within close temporal proximity to her suicide, occurred over the summer months when school was not in session.  In addition, Ms. Vidovic was not at the school, or even enrolled in the school when she actually took her own life. Therefore, although it is certainly reasonable for parents to expect that the school will do its best to protect their children while they

-21-

are under the school's supervision, the law cannot require a school to police its students and former students outside of the school's parameters.  Further, our expectation that the school will exercise its best efforts to protect our children within the school setting does not rise to the level of a constitutional guarantee.   The first exception to the general rule, therefore, does not apply.

Under the state-created danger exception, liability may be assessed to the state if it "cause[s] or greatly increase[s] the risk of harm to its citizens without due process of law through its own affirmative acts." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). A state-created danger claim must establish three elements:  (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).  This is a particularly demanding standard requiring that the state's affirmative action exposed the plaintiff to a danger she wasn't already subject to.  *Sargi v. Kent City Bd. Of Educ.*, 70 F.3d 907, 910-911 (6th Cir. 1995).

Plaintiffs have not made any allegations of affirmative acts by the Defendants in their Amended Complaint.  Further, there is no evidence whatsoever that the Defendants acted affirmatively to create or increase a risk of harm to Ms. Vidovic.  The basis of this lawsuit is the allegation that the school failed to intercede when other students were bullying Ms. Vidovic, and that, in turn, this failure to act contributed to or caused her decision to leave the school and to later commit suicide.  In other words, the Amended Complaint alleges a failure to act, not an affirmative action as the basis for its claims.

-22-

Both the U.S. Supreme Court and the Sixth Circuit have repeatedly held that a failure to act, even with knowledge that a risk of harm may exist without state intervention, is not enough to confer liability under the Fourteenth Amendment.  *See, e.g., DeShaney*, 489 U.S. at 197; *Patterson*, 2008 WL 4858440; *Jones v. Reynolds*, 438 F.3d 895 (6th Cir. 2006); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005); *Weeks v. Portage County Executive Offices*, 235 F.3d 275 (6th Cir. 2000).  Further these cases have been applied to preclude recovery in cases presenting allegations similar to the allegations of deliberate indifference set forth in this action, even when the alleged indifference resulted in death and other bodily harm to innocent and especially vulnerable students.  *See, Soper by Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999); *Mohat v. Mentor Exempmted Vill. Sch. Dist. Bd. Of Educ.,* No. 1:09 CV 688, 2011 U.S. Dist. LEXIS 58310 (N.D. Ohio May 31, 2011); *Doe v. Covington County Sch. Dist*., 675 F.3d 849 (5th Cir. 2012); *Estate of Carmichael v. Galbraith,* No. 3:11-CV-0622-D, 2012 U.S. Dist. LEXIS 857, *3 (N.D. Tex. Jan. 4, 2012);  *Reyna v. Indep. Sch. Dist. No. 1 of Okla. Cty.*, No. CIV-09-1223-D, 2012 U.S. Dist. LEXIS 41863 (W.D. Okla. Mar. 27, 2012); *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 563-565 (11th Cir. 1997).

As discussed above, although parents should be able to expect that their children will be kept reasonably safe when under the school's supervision, and the Court cannot rule out the possibility that a school's failure to protect its students may create liability under some other legal theory, the school had no *constitutional* duty to protect or rescue Ms. Vidovic from harm imposed by other students, or by her own hand.  Consequently, however tragic the events leading up to this lawsuit may be, Plaintiffs have not established that the school's alleged failure to stop the bullying Ms. Vidovic may have suffered, or its failure to somehow prevent her ultimate

suicide, which occurred after she had withdrawn from the school, constitute a violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution.

2. Procedural Due Process

To state a claim for procedural due process, a plaintiff must allege (1) she has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that she was deprived of this protected interest within the meaning of the Due Process Clause; and, (3) that the state did not afford her adequate procedural rights prior to depriving her of that protected interest.  *Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009).

Contrary to the arguments of the Defendants, the Plaintiffs do have protected rights that were affected by the events alleged in the Amended Complaint.  Ms. Vidovic clearly had a protected right to life and there were allegations that she had a right to a public education which was affected by the events set forth in the allegations of the Amended Complaint.  Further, her parents have a protected right to their familial relationship with their daughter.   However, as set forth above, the Defendants did not deprive Plaintiffs of these rights within the meaning of the Due Process Clause.  The Amended Complaint makes clear that the Plaintiffs' losses were caused by the alleged actions of third party individuals, as well as the actions of Ms. Vidovic herself. There can be no question that however desperate and hopeless she may have perceived her alternatives to be at the time, she made the decision to take her own life.  The Constitution does not require the state to implement procedures to protect citizens from themselves, nor does it require the state to provide procedural procedures to protect against a deprivation of rights by a third-party, non-state actor.  The Procedural Due Process guarantees of the United States

-24-

Constitution simply do not apply under these circumstances.

Addressing Plaintiffs' argument that Ms. Vidovic was deprived of her right to education because she was essentially forced to withdraw from Mentor High School and enroll in an on-line school due to the alleged bullying, they cite no legal source to support their argument that this constitutes a deprivation of her rights under the United States Constitution.  Even if there is a constitutional right to a public education, or, more precisely in this case, the right to a choice of how that education is delivered, there is no indication that the school deprived Ms. Vidovic of her education, or that it required her to switch to an on-line course.  Rather she was provided the option of enrolling in an on-line program as a means of protecting her from the alleged bullying while allowing her to complete her state-funded education.  Without some legal support for the argument that offering the on-line completion of her schooling as an option violated a protected constitutional right, Plaintiffs' arguments do not create a claim under the due process clause. Further, even if Ms. Vidovic's change to on-line courses could be considered a constitutional deprivation, Plaintiffs suggest no procedural process that would have been sufficient to protect Ms. Vidovic's rights under the circumstances. Count One of the Amended Complaint must, therefore, be dismissed.

B.  Equal Protection Claim (Count Two)

The Equal Protection Clause "prevents states from making distinctions that: (1) burden fundamental rights; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).   In this case, the Plaintiffs alleged a violation of the Equal Protection Clause based on the Defendants alleged targeting of a suspect class.  To state a claim under the "suspect

class" section of the Equal Protection Clause, a plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.  *LRL Properties v. Portage Metro Hous. Auth*., 55 F.3d 1097, 1111 (6th Cir. 1995).  A plaintiff may also allege that school officials acted with deliberate indifference to discrimination by other students, thereby demonstrating their intent to effectuate or prolong the discrimination.  *Schroeder v. Maumee Bd. of Educ*., 296 F.Supp.2d  869, 874 (N.D. Ohio 2003); *Gant v. Wallingford Bd. Of Educ*., 195 F.3d 134, 140 (2d Cir. 1999).  A claim of deliberate indifference, however, still requires that Plaintiffs demonstrate that the school acted with a discriminatory intent when it failed to respond to student-on-student harassment.  *Williams v. Port Huron Sch. Dist*., 455 Fed.Appx. 612, 618 (6th Cir. 2012)(citing *Gant ex rel. Grant v. Wallingford Bd. Of Educ*., 195 F.3d 134, 139-140 (2d Cir. 1999).

To succeed on a claim for a violation of the Equal Protection clause, the Plaintiffs must show that Ms. Vidovic suffered severe, pervasive, and objectively offensive harassment on the basis of her nationality.  *Williams v. Port Huron Sch. Dist*.,  455 Fed. App'x 612, 618 (6th Cir. 2012).  Further, the Plaintiffs must demonstrate that the school participated in or advanced the discrimination either by discriminating themselves, or by deliberately ignoring known discrimination by other students.  Deliberate indifference can be found when there has been a "clearly unreasonable response in light of the known circumstances."  *Vance v. Spencer Cnty. Pub. Sch. Dist*., 231 F.3d 253, 260 (6th Cir. 2000).

In this case, a comprehensive review of the depositions and other supporting evidence provide the Court with no basis upon which to find that the Defendants either intentionally discriminated against Ms. Vidovic (or her family) based on their nationality, or that they were

deliberately indifferent to discrimination waged against Ms. Vidovic based on her nationality. Plaintiffs have cited no evidence, nor could the Court find any in its review of the record that would indicate that Ms. Vidovic, her parents, or anyone else ever informed the school or its employees that Ms. Vidovic was suffering from discrimination based on her nationality.  There is simply no evidence before the Court that the school or its employees knew or should have known that the bullying Ms. Vidovic is alleged to have suffered was a form of nationality-based discrimination.

Further, in addition to the above mentioned criteria for an equal protection claim based on deliberate indifference to the actions of others, all equal protection claims are based on the premise that members of a protected class have been treated differently than others who are similarly situated.  There is no evidence, nor even any allegation that the school or its employees treated nationality-based bullying differently than any other type of bullying.  In fact, the Plaintiffs have alleged, whether true or not, that the school ignored or otherwise failed to respond appropriately to all types of bullying in the school district.  Further, there is no evidence that Ms. Vidovic's parents were treated any differently than parents of any other nationality, except that the school made efforts to ensure that someone was available to translate from English to Croatian when school officials met with the Vidovics.

In their motion for Summary Judgment Plaintiffs argue that "there is ample evidence that much of the bullying and name-calling was nationality-based . . . These comments were constant . . . Numerous sources reported that this upset her. . . She reported it to school authorities."  (ECF #88, pg. 41).  However, they provide absolutely no citation to any evidence that supports these statements.

There is nothing in Ms. Vidovic's suicide note that indicates the bullying at Mentor was based on her nationality or ethnicity.[7]  Further, there is no evidence cited by Plaintiffs, or seen by the Court that indicates anyone ever witnessed Ms. Vidovic being teased or bullied based on her race; or that would indicate that she or anyone else ever complained to the school on her behalf about nationality-based bullying or teasing.[8]  In fact, the only evidence of anyone ever reporting any such teasing or bullying to the Mentor schools was by Ms. Vidovic's friend Jelena Jandric who indicated that she herself had been the subject of nationality-based comments at Ridge Junior High.  Ms. Jandric testified that she reported these comments to the assistant principal at Ridge, and the offending student was suspended, received detention, and required to attend Saturday school.  (Jandric Depo. at 61).

Having no admissible evidence to support their claims for an Equal Protection Clause violation, Plaintiffs ask the Court to make an inference against the Defendants because they did not create or keep any records that support Plaintiffs' position.  Specifically, Plaintiffs ask the Court to give them an "evidentiary presumption that Ms. Vidovic did in fact complain to school officials, including Goss, about nationality-based discrimination" because Ms. Goss did not keep her notes of counseling meetings with Ms. Vidovic.  There is no basis for imposing such a

---

[7]

 The only indication of nationality-based bullying in the note references her first "couple of" years in the U.S. and her time in middle school, before the family moved to Mentor.

[8]

Sandy Sisa, an intake officer and probation officer for Lake County Juvenile Court indicated that when Ms. Vidovic appeared before her to face charges stemming from a fight at school, Ms. Vidovic told her she was "being made fun of for her ethnicity" at school.  (Sisa Depo. at 22-23). Ms. Sisa did at some point contact the school with regard to the allegations of bullying, however there is no indication that Ms. Sisa or Ms. Vidovic ever told the school that the bullying Ms. Vidovic allegedly suffered was based on her nationality or ethnicity.

presumption in this case.

Pamela Goss testified that she kept personal notes; that Ms. Vidovic had talked with her about problems she had been having with her friends; and, that Ms. Vidovic had told her that a friend had called her "slut" or "whore" one time. (Goss Depo. pg. 42, 48).   Ms. Goss also testified that the friend was brought and in she mediated the issue between the two girls.  (Goss Depo. at 68-69).  According to Ms. Goss's testimony this was a one time occurrence, related to one other individual, and she made the judgment that this was a conflict between friends and was not an incident of bullying.  (Goss Depo. at 49).   Ms. Goss also testified that Ms. Vidovic had reported being "harassed" by way of text messages she received at home. (Goss Depo., pg. 42, 43, ).  She testified that her notes would have indicated whether this happened more than once, and that they would have indicated the types of incidents or things that Ms. Vidovic had talked to her about.  (Goss Depo. at 45, 50).  She also indicated that she had notes from a meeting between staff and Ms. Vidovic's parents addressing how best to protect and integrate Ms. Vidovic upon her return to school after her suicide attempt in January of 2008.  (Goss Depo. at 52-53).   She testified that Ms. Vidovic told her well after the fact that she had been pushed down the stairs, but that Ms. Vidovic had said she didn't know who had done it. (Goss Depo. At 46, 65-68).[9] Ms. Goss had no recollection that Ms. Vidovic had ever complained that anyone made fun of her

---

[9]

 This was the same November, 2007 incident involving Jerry Markley, that Ms. Vidovic had previously reported to a security guard.  As set forth in the fact section of this Memorandum, at the time, Ms. Vidovic and her friend who witnessed the event said she had been pushed on the stairs but that she had not fallen.  The incident was investigated by the school and determined to be an accident.  Further, Ms. Vidovic and Mr. Markley became friends again after the incident.  Ms. Vidovic appears to have changed her story when recounting the incident to others, telling Ms. Goss, her mother, and others that she was pushed down a flight of stairs.

accent or appearance, but remembered that Ms. Vidovic, herself, had made fun of her own body.

(Goss Depo. at 47-48).  Ms. Goss testified as to her recollection of a wide variety of meetings

with Ms. Vidovic, and with school officials related to Ms. Vidovic's situation.   Her deposition

indicates that she has some recollection of every incident that Ms. Vidovic' s parents claim they

reported to school officials.

Plaintiffs have the burden of proof to prove their claims with admissible evidence.  There

is absolutely no evidence in the record that Ms. Vidovic or any other person connected with the

case informed the school, or its employees that she was being discriminated against based on her

nationality.   There is also absolutely no evidence that would suggest that the notes destroyed by

Pamela Goss were destroyed for any improper purpose, or that they would have revealed any

admissible evidence in support of such a contention.  Under these circumstances, the Court will

not impose any presumption about what those notes may have revealed.  Plaintiffs' Equal

Protection Claim in Count Two of the Amended Complaint must, therefore, be dismissed.

C.  Title VI Claim (Count Three)

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, states that "[n]o person in the

United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."  The rights established by this statute are

privately enforceable by a student enrolled in a public school district that receives federal funds.

The standard for proving a discrimination claim under Title VI is at least as stringent as that for

proving an Equal Protection claim.[10]   For the reasons set forth above, Plaintiffs have provided no

_____

[10]

 The parties do not agree on whether Title VI contemplates the possibility for recovery

evidence of either an affirmative act of nationality-based discrimination by the school, or deliberate indifference to *known* severe, pervasive, and objectively offensive student-on-student, nationality-based discrimination.[11]  Count Three, therefore, must be dismissed.

    D.  Title IX Claim (Count Four)

    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX provides a private right of action to enforce its prohibition on intentional sex discrimination, encompassing intentional discrimination in the form of a recipient's deliberate indifference to sexual harassment of a student by another student. *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 642, 143 L. Ed. 2d 839, 119 S. Ct. 1661 (1999). However, Courts have generally concluded that parents, in most cases, cannot bring a claim for sexual harassment of a

---

when there is a claim for deliberate indifference to student-on-student discrimination, or whether it requires an affirmative act of discrimination by the school.  Although neither standard has been met in this case, based on the United States Supreme Court's acknowledgment that deliberate indifference is sufficient to establish a claim under Title IX, and the fact that Title IX treatment has generally been based on the standards set forth for the enforcement of Title VI, this Court would presume that the deliberate indifference standard should also apply to Title VI cases.  *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 642, 143 L. Ed. 2d 839, 119 S. Ct. 1661 (1999);  *Cannon v. University of Chicago*, 441 U.S. 677, 694-695, 99 S. Ct. 1946, 60 L. Ed. 2d 560.

[11]

  Plaintiffs submitted supplemental authority in support of their Title VI claim, citing *Zeno v. Pine Plains Central School Dist.*, 2012 U.S. App. LEXIS 24833 (2nd Cir. Dec. 3, 2012). In *Zeno*, the court affirmed a jury verdict and awarded Plaintiff one million dollars for a claim of deliberate indifference to harassment on the basis of race.  That case is clearly distinguishable, however, because there was no question in *Zeno* that the school had been made aware of severe pervasive discrimination aimed at the Plaintiff on the basis of his race.  In this case, there is no evidence that any race or nationality-based discrimination was ever reported to the school.

child, on their own behalf.  *See, e.g., Phillips v. Anderson County Bd. Of Educ.*, 259 Fed. App'x

842, 843 n. 1 (6th Cir. 2008); *Mohat v. Mentor Exempted Vill. Sch. Dist. Bd. Of Educ.*, No. 1:09

CV 688, 2011 U.S. Dist. LEXIS 58319, *23 (N.D. Ohio May 31, 2011).

In order for a private individual to recover for peer-on-peer harassment the plaintiff must

"establish sexual harassment . . .  that is so severe, pervasive, and objectively offensive, and that

so undermines and detracts from the victims' educational experience, that the victim-student[ is]

effectively denied equal access to an institution's resources and opportunities.  *Id.* at 859.  When

determining whether alleged peer-on-peer harassment is so severe, pervasive, and objectively

offensive that it would create liability against a school for deliberate indifference, the United

States Supreme Court has warned the lower courts that they should  "bear in mind" that "children

may regularly interact in a manner that would be unacceptable among adults" and that students

"often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is

upsetting to the students subjected to it."  *Id.*  "Damages are not available for simple acts of

teasing and name-calling among school children, however, even where these comments target

differences in gender.*"  Id.* at 859.  A determination of deliberate indifference is only required if

the alleged harassment is sufficiently persistent and severe, and if it occurs in a context subject to

the school's control.  *Id.* at 855, 859.

If these two elements are satisfied, the plaintiff must then prove that school actually knew

about the alleged harassment, and that it intentionally remained deliberately indifferent, thereby

subjecting or causing the student to undergo harassment, or making them liable or vulnerable to

the harassment."  *Id.* at 655.  Deliberate indifference is actionable only when a plaintiff can

demonstrate that the school's "response to the harassment of lack thereof is clearly unreasonable

in light of the known circumstances." *Id.* at 648.  A school is not liable for failing to eliminate actionable peer harassment, or for failing to engage in any particular disciplinary action." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000).  However, "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances." *Id.* at 261.

Attempting to prove their claims of severe and pervasive gender-based discrimination, the Plaintiffs cite mainly to incidents that have no obvious connection to gender.  For example Ms. Vidovic's claim that she was pushed down (or on) the stairs, that her purse was once dumped out in the cafeteria, or that her hand was slammed in a locker.  (ECF #86).   There is no evidence whatsoever in the record that these alleged acts or any other physical acts were motivated by Ms. Vidovic's gender, nor is there any evidence that these acts were reported as being in any way gender related.  Further, the Plaintiffs attempt to bundle together their allegations of nationality-based discrimination as proof of severe and pervasive gender discrimination although there is no apparent connection between the two.   Plaintiffs' brief claims that most of the harassment Ms. Vidovic was subjected to was based on her nationality, although as set forth in the prior sections, they offered little to no proof that she actually was subjected to any nationality-based discrimination, and no proof that any nationality-based discrimination was ever reported to the school or its employees.  (ECF #86, at 37, 38).

The only incidents of alleged gender-based discrimination are when Ms. Vidovic was allegedly called "slut," "whore," or "lesbian," and although not cited in their Summary Judgment arguments, the record indicates that there may have been incidents when kids altered her name-calling her  "Slutidjana" or "Slutjana" or some blend of her name and "vagina."   (ECF #88-8; C.

-33-

Vidovic Depo. at 91; Beganovic Depo.at 28).  Although such comments are clearly inappropriate, and obviously could be extremely distressing to any teen-age girl, these are exactly the type of comments and name-calling  that the United States Supreme Court has indicated do not rise to the level of severe and pervasive harassment.  *See, Davis* at 859.   Further, outside of one report Ms. Vidovic made to her counselor referencing that she had been called "slut" and "whore," there is no indication in the record that the school was ever informed of any alleged gender-based name-calling, discrimination, or bullying.  (See, Goss Depo. at 48; Jandric Depo. at 123; Sabljic Depo. at 2680269).  The record shows that the one reported incident was addressed by Ms. Goss; that the comment was made by another girl; that the girl was brought in by Ms. Goss; and, that the two girls attended a supervised mediation that resolved the issue.  There is no indication that the school was ever informed that such name-calling continued past the mediation either by the girl who was involved in the mediation, or by anyone else at the school.

For these reasons, there has been no evidence offered that would support Plaintiffs' claims for relief under Title IV.

E.  Failure to Train/ *Monell* Claim (Count Five)

In Count three, Plaintiffs raise a claim against the Board of the Mentor Public School District, alleging failure to train in violation of its obligations to maintain lawful policies and procedures.   This claim is also brought as a Section 1983 claim.  In order to hold a Board liable, the Plaintiffs must establish that they have asserted the deprivation of a constitutional right, and that the Board is responsible for the violation because of an official policy or custom.  *Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. Of Educ.*, 103 F.3d 495, 505-506 (6th Cir. 1996)(citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

As set forth above, the Plaintiffs have not provided any evidence that could establish the violation of any constitutional right owed to them or to their daughter.   The Amended Complaint asserts that the Board failed to train its employees on the proper procedures to handle bullying, but as set forth above, the school's failure to stop third parties from harming Ms. Vidovic (in this case the bullies, and/or Ms. Vidovic, herself), although tragic and arguably preventable, does not rise to the level of a constitutional violation.  There is no constitutional right to protection from the acts of third parties absent certain exceptions which do not exist in this case.  Further, Plaintiffs have not identified any procedural due process rights that were violated, and have not established any Equal Protection claims under the U.S. Constitution. Therefore, the Amended Complaint does not satisfy the requirements for a Section 1983 *Monell* claim against the Board.

Plaintiffs also fail to satisfy the second requirement for this claim.  The allegations against the Board are centered on the Board's alleged inaction with regard to training and/or establishing proper policies to curb bullying in it's schools.  However, to state a municipal liability claim for inaction, the Plaintiffs must show: (1) a clear and persistent pattern of violating a constitutional right; (2) notice or constructive notice to the School Board; (3) the Board's tacit approval of the unconstitutional conduct amounting to an official policy of inaction; and, (4) that the Board's custom was the "moving force" or a direct causal link in the constitutional deprivation.  *Doe*, 103 F.3d at 508.

The Plaintiffs have made allegations that other Mentor students have committed suicide "at least partially" due to bullying, but they have not shown that these cases involved any constitutional violations by the school.  Further there is no identification of any action the Board

could have taken that could have ensured that  Ms. Vidovic would not be bullied, or that could have prevented her from ultimately deciding to commit suicide.  As such, there is no indication that the school's alleged inaction was the "moving force" behind or constituted a direct causal link to the constitutional deprivations alleged in this case.  Therefore, under the relevant law, Plaintiffs' Amended Complaint does not state a cause of action against the Board for a failure to train, or other 1983 *Monell* claim based on Plaintiffs' s substantive or procedural due process rights under the Fourteenth Amendment of the U.S. Constitution, or under the Equal Protection Clause.  Count Five must, therefore, be dismissed.

     F.  <u>State Law Claims (Count VI, VII, and VIII)</u>

The remaining claims are state law claims that are not dependent on any federal statutes or alleged federal Constitutional violations.  Having determined that there are no federal claims remaining, this Court declines to maintain supplemental jurisdiction over the state law claims. Counts VI, VII and VIII, alleging negligence and/or gross negligence, spoliation of evidence, and malice, bad faith, and wanton and reckless conduct are, therefore, dismissed without prejudice, and may, if appropriate, be re-filed in state court.

**CONCLUSION**

For all of the reasons set forth above, Plaintiffs' Motion for Summary Judgment (ECF #86) is DENIED, and Defendants' Motion for Summary Judgment (ECF #84) is GRANTED. The federal claims set forth in Counts One through Five of the Amended Complaint are dismissed with prejudice.  Counts Six through Eight, which set forth state law claims for negligence, spoliation of evidence,  and bad faith, are dismissed without prejudice and may, if appropriate, be re-filed in state court.  This case is, therefore, dismissed.  It is unnecessary under the circumstances to make a definitive ruling as to the admissibility of the various statements addressed in Defendants' Motion to Strike.  (ECF #92).  That motion is, therefore, denied as moot.  IT IS SO ORDERED.

 /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED:   January 30, 2013

-37-